IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEVEN J. PODKULSKI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 15-cv-11870 |
| v. | ) |
| | ) Judge Andrea R. Wood |
| TARRY WILLIAMS, et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

In October 2014, Plaintiff Steven Podkulski was an inmate at Stateville Correctional Center ("Stateville") and scheduled for release. Podkulski, however, refused to sign the release paperwork, in part because he was to be released to the custody of Bedford Park police and arrested for murder. At some point during the discharge process, Podkulski lost consciousness and awoke in a holding cell physically restrained by tactical officers. Upon regaining consciousness, he requested medical attention, telling officers that he was injured and feeling suicidal. Podkulski also claims that, upon his release, he did not receive a supply of medication necessary to treat several serious conditions, including seizures and depression, thereby subjecting him to complications from those conditions. Based on these events, Podkulski brought this suit asserting claims under 42 U.S.C. § 1983 for deliberate indifference to a serious medical need against Defendants Tarry Williams (then-warden of Stateville), Salvador Godinez (Acting Director of the Illinois Department of Corrections), Nurse Leigh A. Bell, and Nurse Tiffany Utke. Now before the Court are Defendants' motions for summary judgment. (Dkt. Nos. 132, 143.) For the reasons stated below, Defendants' motions are granted.

**BACKGROUND**

Unless otherwise noted, the following facts are undisputed.

On October 22, 2014, Steven Podkulski, an inmate at Stateville, was scheduled to be released onto Mandatory Supervised Release. (Pl.'s Resp. to Defs. Bell and Utke's Statement of Material Facts ("BUSMF") ¶ 7, Dkt. No. 150; Pl.'s Resp. to Defs. Williams and Godinez's Statement of Material Facts ("WGSMF") ¶ 7, Dkt. No. 151.) At some point during the discharge process, Podkulski became aware that Bedford Park police were waiting to arrest him for murder. (WGSMF ¶ 7.) Podkulski then refused to sign the release forms. (BUSMF ¶ 7; WGSMF ¶ 7.) In response, Tarry Williams, the warden of Stateville, informed staff that they should not worry about getting Podkulski's signature and had him escorted from the room. (*Id.*) As Podkulski left the room, he lost consciousness for an unknown reason. (*Id.*)

According to Podkulski, he regained consciousness in a holding cell to find his legs raised and his arms pulled back with several tactical officers on top of him, kneeling on his back and neck. (BUSMF ¶ 8; WGSMF ¶ 8.) Podkulski then requested medical assistance, stating that he had been physically injured and had suicidal thoughts. (*Id.*) Following this request, Nurse Leigh Bell and Nurse Tiffany Utke each individually reported to the holding cell (*Id.*) Nurse Bell is a Licensed Clinical Professional Counselor who was working as a Qualified Mental Health Professional at Stateville at the time. (BUSMF ¶ 2; WGSMF ¶ 4.) As part of her job duties, Nurse Bell provided crisis intervention counseling to inmates in crisis situations, conducted lethality assessments, and implemented suicide precaution regulations when necessary. (BUSMF ¶ 2.) Nurse Bell was never involved with the distribution of medications to any inmates. (*Id.* ¶ 17.) Nurse Tiffany Utke is a Licensed Practical Nurse ("LPN") who worked at Stateville in 2014. (BUSMF ¶ 3; WGSMF ¶ 5.) Upon each of their arrivals, Podkulski contends that he informed

2

Nurse Bell and Nurse Utke that he had lost consciousness, was feeling suicidal, and had neither been given his medication that morning nor been provided medication to take with him upon discharge. (BUSMF ¶ 8.)

Illinois Department of Corrections ("IDOC") policy requires the creation of a Crisis Intervention Team to respond to crisis situations, such as when an inmate expresses suicidal thoughts. (*Id.* ¶¶ 11–12.) This policy also directs crisis team members who are not independently licensed mental health clinicians to complete an Evaluation of Suicide Potential Form to assess lethality for an inmate in crisis—that is, to evaluate the risk of suicide. (*Id.* ¶ 11.) This form provides space for evaluators to record both self-reported information provided by the inmate and the evaluator's own observations. (*Id.* ¶ 14.) Nurse Bell was a crisis team member and, as part of her job duties, routinely performed such evaluations to determine inmate suicide potential. (*Id.* ¶ 13.)

On October 22, 2014, at approximately 10:15 a.m., Nurse Bell used her clinical judgment to conduct an assessment of and fill out an Evaluation of Suicide Potential for Podkulski. (BUSMF ¶¶ 14–15; WGSMF ¶ 9.) Section I of the form addresses "Risk Factors" and requires the evaluator to select "yes" or "no" as to 15 risk factors, with space provided for the evaluator to include their own observations. (Pl.'s Resp. to Bell & Utke's Statement of Material Facts ("PRSMF"), Ex. D, Eval. of Suicide Potential Form at 1, Dkt. No. 150-4.)[1] At the bottom of the page, the evaluator is then asked to calculate the total number of yes/no responses in each column. (*Id.*) Pursuant to policy, inmates who score greater than 5 on the risk factors should be reviewed for crisis watch and referred for a mental health evaluation. (BUSMF ¶ 15; Eval. of Suicide

---

[1] The parties have all attached copies of various documents, including deposition transcripts and medical records, to their various statements of facts. For ease of reference, the Court will refer only to one set of exhibits.

3

Potential Form at 2.). Nurse Bell noted that only 2 of the 15 risk factors were present: Podkulski "seem[ed] overly anxious, afraid, or angry" as he was yelling at officers about not being able to refuse parole and "express[ed] thoughts of killing him[self]." (Eval. Of Suicide Potential Form at 1.)

Section II of the form similarly covers "Protective Factors," for which Podkulski was noted as having 3 of 8 factors present, which the evaluator should take into consideration when determining whether crisis watch is needed. (*Id.* at 2.) On the form, Nurse Bell also recorded her observations of Podkulski, writing that Podkulski "present[ed] as angry" and was yelling about his legal rights being violated. (BUSMF ¶ 15; Eval. Of Suicide Potential Form at 3.) She further recorded that Podkulski called for a crisis team member because he was not being allowed to refuse parole, and that he did not endorse an active plan or intent for either self-harm or harm of others at the time of observation. (*Id.*) Based on her evaluation, Nurse Bell indicated that no crisis status should be ordered and recommended that Podkulski be returned to general population housing. (Eval. Of Suicide Potential Form at 2.)

Shortly after Nurse Bell completed her evaluation, Nurse Utke completed an Offender Injury Report for Podkulski. (BUSMF ¶ 20; WGSMF ¶ 11.) Nurse Utke indicated that she did not know how the injury occurred or whether it was witnessed by staff, but nonetheless did check that the injury was self-inflicted and recorded that it occurred at 10:30 a.m. that morning. (WGSMF ¶ 11.) The second page of the report was completed at 10:45 a.m. on October 22, 2014. (*Id.* ¶ 11.) There, Nurse Utke recorded that Podkulski had "no noticeable injuries at this time" and "refused all medical treatment." (BUSMF ¶ 20; WGSMF ¶ 11.) According to Podkulski, however, Nurse Bell and Nurse Utke chose not to provide any further medical attention not based on their own independent evaluations, but because Williams told both of them not to do anything for him.

4

(Defs. Williams and Godinez's Resp. to Pl.'s Statement of Additional Material Facts ("WGSAMF") ¶¶ 15–16, Dkt. No. 155; Defs.' Bell and Utke's Resp. to Pl.'s Statement of Additional Material Facts ("BUSAMF") ¶¶ 15–16, Dkt. No. 161.) Williams, Nurse Bell, and Nurse Utke deny that this occurred.

Podkulski was eventually taken into custody by the Bedford Park Police Department on a murder warrant and transported, via squad car, to the station. (BUSMF ¶ 22; WGSMF ¶¶ 12–14.) Podkulski never entered the station, however, as he was immediately taken to MacNeal Hospital in an ambulance. (WGSMF ¶ 15.) Podkulski arrived at MacNeal Hospital at 12:12 p.m. and was discharged back to the custody of the Bedford Park Police Department between approximately 2:30 p.m. and 3:00 p.m. without any medication. (*Id.* ¶¶ 16, 19.) Medical records indicate that he presented with muscle pain, although X-rays of Podkulski's lumbar spine, knee, and ankle all showed "no radiographic evidence of acute fracture." (*Id.* ¶ 18.) The notes also record that Podkulski stated he was at 0/10 on the pain scale and did not have any pain, and a physical exam noted his face and head were atraumatic. (*Id.*) Nonetheless, Podkulski maintains that he suffered injuries to his ribs and legs, as well as a permanent injury to his shoulder that still causes pain. (*Id.*)

While at MacNeal Hospital, Podkulski again expressed suicidal thoughts, although the parties dispute when and how he made those statements. Podkulski asserts that he immediately informed medical providers at MacNeal Hospital that he was suffering from suicidal and homicidal thoughts. (WGSAMF ¶ 19; BUSAMF ¶ 19.) Defendants, however, maintain that Podkulski initially reported as non-suicidal, with the discharge summary for his visit stating that he "reported passive suicidal thoughts only after being informed he was discharged, do not suspect need for acute inpatient psychiatric illness and recommend suicide watch while in

5

custody." (WGSAMF ¶ 19; BUSAMF ¶ 19; WGSMF, Ex. 8, MacNeal Hospital Medical Records at WD 000127, Dkt. No. 151-8.) Medical notes also record that it was noteworthy that "once [Podkulski] was notified that he was being discharged he began to scream and fight, stating 'I'm suicidal,'" which was "not something that [Podkulski] reported before and was clearly related to him being discharged back into custody." (WGSMF ¶ 17; MacNeal Hospital Medical Records at WD 000129.)

Podkulski also complains that Defendants failed to provide him with medication upon his release. In October 2014, Stateville policy directed that inmates were to be discharged with a two-week supply of medication, if recommended by a medical professional. (BUSMF ¶ 19.) Inmates were to receive this supply from the nursing staff along with a prescription for an additional two-week supply. (*Id.*) The nurse responsible for distributing the medications varied depending on who was available to be assigned to the task. (*Id.*) At the time of his discharge, Podkulski was on medication to treat various conditions, including seizures and depression. (BUSAMF ¶ 2.) In August 2014, Podkulski filed a grievance expressing concern that he would not be given medication to cover the transition period between his discharge and finding a new provider for his medications. (*Id.* ¶ 1.) Specifically, Podkulski noted that he had been informed he would not receive medical equipment to administer or check his blood-sugar level and requested that he be provided such equipment along with his two-week supply of medication. (PRSMF, Ex. A, Grievance Officer's Rep. at 2, Dkt. Nos. 150-1.) Noting that Nurse Utke reviewed Podkulski's medical records, the Grievance Officer found that Podkulski would be given a two-week supply of medication (along with a prescription for two more weeks) and stated that Podkulski would need to go to the nearest health department to obtain any other medical equipment. (*Id.* at 1.)

6

The morning of his release, Podkulski received his dose of medications as prescribed. (BUSMF ¶ 23.) Bedford Park police were also given blister packs of two separate medications, although it is unclear which drugs were provided and what conditions they were meant to address. (WGSMF ¶ 13.)

That night, after being discharged from MacNeal Hospital (with no medications prescribed) and returned to the Bedford Park police station, Podkulski suffered seizure symptoms and again lost consciousness. (WGSMF ¶ 20.) Podkulski, however, told Bedford Park police that he was fine and did not request any additional medical attention. (*Id.*)

## DISCUSSION

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Courts may consider the "'materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials'" in deciding a motion for summary judgment. Fed. R. Civ. P. 56(c)(1)(A).

    I.    **Godinez**

First, Defendants contend Godinez is entitled to summary judgment because he was not personally involved in the events at issue. "The doctrine of *respondeat superior* does not apply to § 1983 actions; thus to be held individually liable, a defendant must be personally responsible for the deprivation of a constitutional right." *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2000) (internal quotation marks omitted). However, "a supervisor may still be personally liable

for the acts of his subordinates if he approves of the conduct and the basis for it." *Backes v. Vill. of Peoria Heights*, 662 F.3d 866, 870 (7th Cir. 2011) (internal quotation marks omitted). In other words, "[t]o show personal involvement, the supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see." *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (internal quotation marks omitted).

The parties do not dispute that Godinez, the Acting Director of the Illinois Department of Corrections in October 2014, was not present at Stateville on October 22, 2014. (BUSMF ¶ 5; WGSMF ¶ 3.) Podkulski, however, advances that Godinez is nonetheless still personally liable because, as a supervisor, he failed to implement procedures to adequately address the needs of inmates who suffer from mental illness. According to Podkulski, Godinez should have been aware that the current procedures were inadequate given the existence of class actions filed against the IDOC alleging insufficient treatment of mental health conditions. But that Godinez may have been generally aware that various mental health procedures were inadequate is not enough to show that he knew about the events of October 22, 2014, or even that he knew about issues with the procedure for dealing with an inmate who has expressed suicidal thoughts, to say nothing of demonstrating that he then facilitated, approved of, or condoned them. *See, McDonald v. Obaisi*, No. 16-CV-5417, 2017 WL 4046351, at *5 (N.D. Ill. Sept. 13, 2017) (dismissing claims where the complaint failed to allege that the defendant was aware of or involved in the particular misconduct of his subordinates).

Because Podkulski has not adduced any evidence of Godinez's personal involvement in the events of October 22, 2014, he cannot sustain a § 1983 claim against him. The Court therefore grants summary judgment in Godinez's favor.[2]

---

[2] Podkulski also argues that Godinez failed to properly instruct his personnel to provide medication to treat his serious medical conditions. Setting aside the threshold issue of personal involvement, Podkulski

## II. Defendants Williams, Bell, and Utke

Defendants next assert that Williams, Nurse Bell, and Nurse Utke are entitled to summary judgment because Podkulski cannot satisfy the elements of a deliberate indifference claim against them. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 328 U.S. 153, 173 (1976)). A plaintiff asserting a claim for deliberate indifference must make two showings: first, that he suffered from "an objectively serious medical condition," and second, that "a state official was deliberately, that is subjectively, indifferent" to that condition. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). Objectively serious medical conditions are those that "ha[ve] been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (internal quotation marks omitted). Such medical conditions need not be life-threatening but may instead include conditions that, left untreated could "result in further significant injury or unnecessary and wanton infliction of pain." *Id.* Demonstrating the second, subjective element of a deliberate indifference claim "requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk." *Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016).

Podkulski asserts claims against Williams, Nurse Bell, and Nurse Utke for deliberate indifference with respect to his threats of suicide, physical injuries he alleges he sustained during

---

points to no evidence to support this claim, other than his assertion that he personally did not receive such medications. In fact, as the response to Podkulski's grievance indicates, it was IDOC policy to provide a two-week supply of medication to inmates upon discharge along with a prescription for an additional two weeks' worth of medication.

9

the discharge process, and the failure to provide him with a two-week supply of medication upon his release. The Court addresses each in turn.

### A. Threats of Suicide

First, Podkulski claims that Williams, Nurse Bell, and Nurse Utke were deliberately indifferent to his risk of suicide. The Seventh Circuit has determined that suicide is an objectively serious harm. *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003). Defendants, however, dispute that Podkulski can demonstrate that he was "on the verge of committing suicide" on October 22, 2014, such that he had an objectively serious medical condition. *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003). In particular, Defendants note that the only evidence Podkulski offers to support this condition is his own testimony, while contemporaneous medical evaluations by both Nurse Bell and, hours later, staff at MacNeal hospital, found that he was not at risk of suicide such that any intervention was necessary. And, as Defendants observe, Podkulski's behavior was consistent with a desire to use a suicide threat as a means to get placed into a crisis hold and thus delay his release from Stateville—after all, Podkulski had only just learned that he was to be discharged into the custody of Bedford Park police in connection with a warrant for murder. In Defendants' view, there was never any genuine risk of self-harm so as to constitute an objectively serious medical condition, only a self-serving desire to avoid being immediately placed into the custody of law enforcement. However, because Podkulski fails to create a dispute of fact as to whether any Defendant knew of and disregarded a high risk that Podkulski would self-harm, the Court need not resolve whether Podkulski's evidence could show an objectively serious medical condition.

To prevail on his deliberate indifference claim, Podkulski must prove that "each individual defendant subjectively knew that [Podkulski] was at substantial risk of committing suicide ***and***

that each individual defendant intentionally disregarded that risk." *Matos*, 335 F.3d at 557. It is well-established that for claims of deliberate indifference a "medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (internal quotation marks omitted). And non-medical professionals like Williams (or even Nurse Utke, who is not a trained mental health professional) may rely on the determination of a medical professional like Nurse Bell. *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013).

Here, after Podkulski stated he was experiencing suicidal thoughts and requested a crisis team member, Nurse Bell, a mental health professional, arrived and evaluated him. Following protocol, Nurse Bell interviewed Podkulski and completed the standard Evaluation of Suicide Potential Form to assess his risk of suicide. Protocol dictates that further action (review for crisis watch and referral to a mental health professional) may be necessary when an inmate scores 5 or higher points on suicide risk factors. Nurse Bell's evaluation, however, indicated that Podkulski only displayed 2 of 15 suicide risk factors and demonstrated 3 of 8 suicide protective factors. Using her clinical judgment, Nurse Bell determined that Podkulski was ***not*** at substantial risk of suicide and therefore she did not recommend any further action. While Podkulski suggests that he was not treated for his suicidal thoughts because Williams told Nurse Bell and Nurse Utke not to treat him (which Defendants dispute), the record is clear that Nurse Bell did, in fact, evaluate Podkulski and independently determine that there was no need for any additional treatment. Put simply, Podkulski points to no evidence that would support a finding that Nurse Bell (and relatedly, Williams and Nurse Utke, who were entitled to rely upon her determination) subjectively knew that his risk of suicide was high and yet proceeded to disregard that risk. Instead, the opposite is true: Podkulski expressed thoughts of suicide, prison officials responded

by calling a qualified mental health professional (Nurse Bell), and that professional determined the risk of suicide was not so high as to require action.

Podkulski nonetheless insists that there is a genuine dispute of material fact because he was not given treatment even after expressing suicidal thoughts—in essence, Podkulski suggests that every time an inmate expresses suicidal ideations, failure to place them under a crisis watch or take other action is *de facto* deliberate indifference.[3] But Defendants have provided evidence showing that they did not place Podkulski under crisis watch or take any other action[4] not because they were deliberately indifferent to his purported suicidal tendencies, but instead on the basis of a medical determination that such action was unnecessary. To rebut this evidence, Podkulski must show that Nurse Bell's findings and recommended actions were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (internal quotation marks omitted).

Podkulski, however, is unable to point to anything in the record that could support a finding that not providing treatment to an individual in his situation departed so substantially from professional practice. In fact, as the Evaluation of Suicide Potential form shows, explicit statements of suicidality are only one factor of many that protocol dictates must be considered when assessing suicide risk. And, critically, other medical providers at MacNeal Hospital affirmed

---

[3] At times Podkulski also seems to argue that there is a genuine dispute of material fact as to whether he communicated suicidal thoughts. This is not so—Defendants admit that Podkulski stated that he was suicidal while at both Stateville and MacNeal Hospital. Defendants' position is not that Podkulski never indicated that he was suicidal, but rather that other factors indicated the suicide risk was such that no additional preventative measures had to be taken.

[4] The Court notes that Podkulski repeatedly claims that he was entitled to treatment that he did not receive. Podkulski does not, however, provide any details as to what form that treatment should have taken, be it being placed on suicide watch, given medications that might treat his suicidal thoughts, or any other treatment option.

Nurse Bell's actions and conclusions, finding no crisis intervention warranted even after Podkulski again stated he was suicidal. In light of the evidence, Podkulski's own conclusory claims that only those acting with deliberate indifference could have failed to treat his suicidal ideations cannot serve to create a dispute of material fact as to whether Defendants subjectively knew and subsequently disregarded his risk of suicide.

### B. Physical Injuries

Defendants also contend that Podkulski cannot prevail on any claims relating to their failure to treat physical injuries Podkulski alleges he suffered during the discharge process. Specifically, Podkulski maintains that he was injured and in pain from being hog-tied by other (non-defendant) individuals after refusing to sign his release paperwork.

A "significant delay in effective medical treatment also may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain." *Berry v. Peterman*, 605 F.3d 435, 441 (7th Cir. 2010). Here, although Podkulski alleges that he was in pain, he points to no delay in medical treatment. It is undisputed that Nurse Utke came to the holding cell to evaluate Podkulski for injuries, and that Podkulski refused assessment and all medical treatment. Setting aside that any delay in treatment was caused by Podkulski's own refusal of care, Podkulski was transported to MacNeal Hospital within a few hours of the alleged injury. Podkulski provides no basis from which a jury could conclude that such a short delay rose to the level of a constitutional violation. *See, e.g.*, *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) ("We have held in the past that a two-hour delay is not an unreasonably long wait for an x-ray, an examination, and possibly a set of a fracture.")

Beyond Podkulski's own testimony that he did in fact suffer an injury, there is also no evidence in the record to support that such injury constituted an objectively serious medical

13

condition. Although Podkulski refused to be assessed, Nurse Utke noted that he did not have any noticeable injuries. Furthermore, X-rays taken at MacNeal Hospital revealed no fractures in any of the areas where Podkulski claims to have been injured and a physical exam noted no signs of trauma. In fact, medical records indicate that Podkulski was not in any pain at all upon admission to MacNeal, as he self-reported being at "0/10" on the pain scale.

In sum, Podkulski offers no evidence from which a trier of fact could find that Defendants were deliberately indifferent to any physical injury.

### C. Provision of Medication

Lastly, Defendants argue that they cannot be held liable for failing to provide Podkulski with a supply of medications because there is no constitutional right for prisoners to be released with such medication. The Court need not reach this issue, however, because Podkulski has failed to produce evidence showing that Williams, Nurse Bell, or Nurse Utke was personally involved in the decision to release him without a supply of his medication. It is undisputed that Nurse Bell had no authority to dispense medications to inmates—accordingly, she cannot be responsible for his failure to receive any. And while Podkulski claims that Williams told Nurse Bell and Nurse Utke not to treat him, those allegations relate to treatment of Podkulski's claimed injuries and suicidal ideation. There is no evidence in the record—indeed, there is not even an allegation—that Williams further directed other medical personal not to dispense any medication.

Accordingly, Podkulski primarily contends that Nurse Utke was responsible for ensuring he received his medication upon release. But Nurse Utke was involved with Podkulski's care on October 22, 2014 only to the extent that she was called into the holding cell to evaluate him for injuries following his request for a crisis evaluation. There is simply nothing in the record to indicate that she was also responsible for dispensing medications as part of Podkulski's routine

discharge process. Podkulski, however, asserts that because Nurse Utke was aware of his medication needs due to her review of the grievance form he filed six weeks before his discharge, she therefore had a duty independently to ensure that he received his medication upon discharge. Setting aside that merely reviewing Podkulski's medical records weeks before his release almost certainly did not make Nurse Utke personally responsible for ensuring that Podkulski would receive his medications upon discharge, the grievance form does not provide any evidence that Nurse Utke knew of Podkulski's need for medications to treat seizures and depression. This is because the grievance form did ***not***, as Podkulski maintains, relate to a concern that he would not be provided those medications upon release. Rather, the grievance form clearly indicates that Podkulski was concerned about his ability to receive medical equipment to administer his diabetes medication—there is no mention of any fear that he would not receive medications required to treat other conditions.

Therefore, because Podkulski advances no evidence to support that any Defendant was personally involved in dispensing (or failing to dispense) his medications, the Court need not address whether he had a constitutional right to receive them.[5]

\*\*\*

In sum, Podkulski has failed to demonstrate a genuine issue of material fact with respect to any of his claimed bases for asserting that Williams, Nurse Bell, and Nurse Utke were deliberately indifferent to his serious medical needs. As a result, the Court grants summary judgment in their favors.

---

[5] For similar reasons, the Court need not address Defendants' argument that Podkulski suffered no harm from any failure to provide medication.

15

## CONCLUSION

For the reasons given above, Defendants' motions for summary judgment (Dkt. Nos. 132, 143) are granted. The Clerk will enter Judgment in favor of Defendants.

ENTERED:

Dated: March 31, 2022

_____
Andrea R. Wood
United States District Judge